UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR419-086 |
| | ) | |
| STEPHEN LAMAR SPENCER, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Defendant Stephen Lamar Spencer is charged with one count of possession with intent to distribute a controlled substance (cocaine and crack cocaine), in violation of 21 U.S.C. § 841(a)(1).  Doc. 1 (Indictment). He moves to suppress all evidence collected after his arrest.  Doc. 25.[1]  On September 11, 2019, the Court held a hearing on defendant's motion.  For the reasons explained below, his motion should be denied.

**BACKGROUND**

Spencer was arrested after officers received an anonymous 911 call reporting drug sales at a location in Liberty County, Georgia.  Doc. 25 at 1-2.  The caller provided a general description of the individual and his

---

[1] Spencer filed two copies of his suppression motion. *Compare* doc. 24, *with* doc. 25. At the hearing, counsel confirmed that there was only one suppression motion before the Court. For simplicity, the Court will refer exclusively to the second version of the motion, as that is the version to which the Government responded. *See* doc. 27 (Opposition to doc. 25). The Clerk is **DIRECTED** to **TERMINATE** the redundant motion (doc. 24) as moot.

car. *Id.* Officers, already nearby, went to the intersection identified in the call and observed a car matching the general description provided and two men walking away from the area. At the hearing, two Liberty County Sheriff's officers, Captains Bowman and Ashdown[2], testified that, as they approached the area, their suspicions were aroused, not only by the information provided by the call, but by the activity they observed. Both officers testified that they knew the area in question to be a high crime area, and particularly known for drug activity and break-ins of unoccupied structures to steal scrap metal (*i.e.,* copper wiring). Given the vehicle's location near an apparently unoccupied structure, both officers testified they would have approached the individuals they observed regardless of the 911 phone call, if only to identify them.[3]

---

[2] At the time of the events at issue, Captain Ashdown was a detective and Captain Bowman was a lieutenant. *See* doc. 27 at 2. In the analysis below the Court refers to the officers by their current ranks.

[3] Captain Bowman testified that he would have attempted contact with the driver of the vehicle and the individuals on foot because the nearby structure appeared to be abandoned and isolated from other occupied buildings, and "there could have been a theft." Captain Ashdown testified that he approached the "residence," *i.e.* the dilapidated structure, "because of the activity that was going on when [officers] pulled up," including two individuals departing "briskly" on foot, and one "in a vehicle on an abandoned piece of property." Upon cross-examination, Ashdown clarified that the situation he observed when he arrived required him to investigate "if [the individuals he observed] belonged there."

As Captain Bowman approached the two individuals, Captain Ashdown approached the parked vehicle. He testified that he activated his "blue lights" and parked his unmarked vehicle, blocking the driveway where Spencer's vehicle was parked. As he exited his vehicle, Spencer exited and moved quickly—"charged," in Ashdown's words—toward Ashdown. Ashdown drew his weapon and directed Spencer to return to his vehicle. Spencer complied, sitting in the driver's seat with the door open and his feet resting on the ground. Ashdown testified that once Spencer returned to his car, he holstered his weapon.

Ashdown approached Spencer sitting in the car and requested identification. While Spencer was looking for his identification, Ashdown observed a transparent "medicine bottle," full of what he immediately identified as crack cocaine. Subsequent testing of the material showed that it was indeed crack cocaine. To ensure that the situation did not escalate, Ashdown asked Spencer to accompany him back to his vehicle. He handcuffed Spencer and had him sit down on the ground. After Spencer was handcuffed and sitting on the ground, Ashdown informed him that he was under arrest. A subsequent search of his vehicle produced additional narcotics, currency, a scale, and plastic "baggies."

## ANALYSIS

As explained below, there is some uncertainty in the parties' submissions. Nevertheless, the Court is convinced that the Government has borne its burden of showing that the Fourth Amendment was not violated during the sequence of events that culminated in the discovery of the narcotics and Spencer's arrest. Spencer properly bears the burden of establishing that a Fourth Amendment implicating search or seizure took place. *See, e.g., United States v. Bachner*, 706 F.2d 1121, 1125 (11th Cir. 1983). As discussed more fully below, he can meet that burden based on the undisputed facts, which establish that he was seized almost immediately after officers arrived. There is also no dispute that no warrant was obtained in this case. Accordingly, "the burden of proof shifts to the state to establish that an exception to the search warrant requirement was applicable in the subject case and that the search and seizure was, in fact, a reasonable one." *Id.* at 1126.

The Government first argues that the property where these events occurred was an "open field," for Fourth Amendment purposes. Doc. 27 at 3-4. The Government is certainly correct in asserting that "an individual may not legitimately demand privacy for activities conducted

out of doors in fields, except in the area immediately surrounding the home." *Oliver v. United States*, 466 U.S. 170, 178 (1984). That contention is relevant to the extent that it establishes that the officer's initial observations were not a Fourth Amendment "search." Whether Spencer was a trespasser on the property or had some right of access,[4] the fact that officers' initial observations were made from a public location indicates that those observations were not, themselves, a "search." *See Florida v. Riley*, 488 U.S. 445, 450 (1989) (even the curtilage of a home is not protected police observation from "a public vantage point where they [*i.e.*, the police] have a right to be." (quotes, alterations, and cite omitted)); *Oliver*, 466 U.S. at 182 ("'Even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon.'" (quoting *Rakas v. Illinois*, 439 U.S. 128, 144, n. 12 (1978) (alterations omitted)); *United States v. Contreras*, 820 F.3d 255, (7th Cir. 2016) (arguments about defendant's expectation of privacy in his garage

---

[4] Spencer did not introduce any evidence concerning his connection to the property and none was elicited through the cross-examination of the Government's witnesses. Spencer's brief describes the property, without any further explanation, as "his family property." Doc. 25 at 2.

were "red herrings" where police observed the drug transaction from a public street).

The Government's offers several arguments that would preclude suppression. First, it argues that, even if the dilapidated structure distinguished the property from an open field, Spencer still lacks "standing" to challenge a search of the property.[5] Further, the Government argues that, even if the property were not an open field, and defendant had some expectation of privacy, detectives made a reasonable mistake of fact that the property was abandoned. Doc. 27 at 3-7. Those arguments miss the mark.[6] Spencer's most plausible argument for

---

[5] Whether a criminal defendant has "a reasonable expectation of privacy which society is prepared to accept," is often referred to as his Fourth Amendment "standing" to challenge the search of a particular area. *See generally Rakas v. Illinois*, 439 U.S. 128 (1978). Although the suppression movant has the burden of establishing his "standing," the requirement is not jurisdictional. *Byrd v. United States*, ___ U.S. ___, 138 S. Ct. 1518, 1531 (2018) ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."). It is merely one element of the merits of a defendant's Fourth Amendment claim, albeit one that may constitute a threshold to further merits inquiry.

[6] The Government's brief suggests that the "open field" or related "reasonable expectation of privacy" analyses might entirely resolve Spencer's motion. *See* doc. 27 at 4-7. Even if the property at issue were an open field, however, officers could not, consistent with the Fourth Amendment, seize Spencer, in his car or on foot, and search him while he was on that field, or indeed any other public location. *See infra.* at 7-8. This is not a case in which the evidence the Government seeks to introduce was discovered *in* the open field, it was discovered in Spencer's car. Ashdown's access to the car depends upon the seizure. Put differently, the seizure is a direct "but for"

suppression does not depend upon his reasonable expectation of privacy in the property at issue. It depends upon whether the officers' actions amounted to a "seizure" of his person, or some other Fourth-Amendment-implicating intrusion of his liberty, and, if they did, whether officers had the requisite indicia of criminality to justify that intrusion. *See* doc. 25 at 3 (identifying the only issue presented as whether the "seizure" violated Spencer's Fourth Amendment rights).

"It is *quite plain* that the Fourth Amendment governs 'seizures' of the person [even those which] do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that *whenever* a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968) (emphasis added). Similarly, "the usual traffic stop is more analogous to a so-called 'Terry stop,' [cit.], than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Longstanding Fourth Amendment jurisprudence, therefore, establishes

---

cause of the subsequent search. Spencer's framing of the issue, *see* doc. 25 at 3, then, is correct; if the seizure violated the Fourth Amendment, then the subsequent search and discovery of the evidence would seem to be "fruit of the poisonous tree." *Cf.* 6 Wayne R. LaFave Search & Seizure § 11.4(d) (5th ed. 2019) (identifying "the typical case in which an illegal arrest [or seizure short of a full arrest] is followed by a search" as presenting "no 'fruits' problem of any magnitude").

7

incontrovertibly that when Ashdown prevented Spencer from leaving the scene, either in his car or on foot, he was 'seized,' in the *Terry* sense.

*Terry* recognized, "an entire rubric of police conduct—necessarily swift action predicated upon on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be subject" to the full protection afforded by requiring police to obtain a warrant. 392 U.S. at 20. As the Government points out, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also* doc. 27 at 7. That is how the sequence of events leading to Spencer's arrest started, or, at least, the portion of those events that implicates the Fourth Amendment.

The "brief investigatory stop" contemplated in *Terry* does not require probable cause, but only "a reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity." *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). "The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" *United States v.*

8

*Sokolow*, 490 U.S. 1, 7 (1989) (quotes and cite omitted). "Reasonable suspicion" requires evaluation of the "totality of the circumstances—the whole picture." *Id.* at 8. Further, conduct that is, in itself, completely innocent may provide the basis for an officer's reasonable suspicion. *See id.* at 9-10 ("We noted in [*Illinois v.*] *Gates*, 462 U.S. [213] . . . 243-244, n. 13, . . . , that 'innocent behavior will frequently provide the basis for a showing of probable cause,' and that 'in making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry." (alterations omitted)). Captains Ashdown and Bowman clearly articulated their reasonable suspicion for a brief investigatory stop.

Both officers testified that when they arrived location, they observed defendant's car parked at what appeared to him to be a derelict structure.[7] Both further testified that, in their experience, such

---

[7] Spencer's brief waives at a question about the reliability of the anonymous caller. *See* doc. 25 at 2 (noting "[t]here is no additional information as to the identity of the anonymous caller or his veracity."). The point is accurate, as far as it goes; beyond the broad similarity between the caller's description and the scene the officers found, there is no particular indicia of the caller's reliability. Nevertheless, the Government has argued, and both officers' fully credible testimony supports, that they had independent

structures in the area were frequently the targets of thieves. Given that experience, they agreed that *any* car parked near such a structure would arouse suspicion and they would, at least, seek to ascertain the driver's identity. Courts have frequently recognized that loitering near abandoned buildings is a basis for reasonable suspicion of criminal activity. *See, e.g., Clark v. City of Atlanta,* 544 F. App'x 848, 854 (11th Cir. 2013) (concluding officers had reasonable suspicion for a seizure where, "[t]he undisputed evidence shows that, at the moment of the seizure, the officers were aware that there had been a rash of burglaries in the area, that vacant properties were often targeted for burglaries, and that the property where the [defendants] were standing appeared to be vacant."); *United States v. Tucker*, 184 F. App'x 549, 553 (7th Cir. 2006) (officer investigating otherwise unsubstantiated anonymous tip nevertheless had reasonable suspicion based on defendant "loitering" near an abandoned house in a high-crime area, where officer knew vacant houses were often used for criminal purposes); *United States v. Clay*, 181 F. App'x 542, 544 (6th Cir. 2006) (concluding officers had reasonable

---

reasonable suspicion to initiate a *Terry* stop based on their own observations. *See* doc. 27 at 7-8. Since the Court finds that those observations were sufficient to create reasonable suspicion justifying the *Terry* stop, there is no need to determine whether the anonymous tip provided reasonable suspicion.

suspicion to stop a vehicle based upon, among other factors, defendants' presence at an abandoned house in a high crime area); *Butler v. City of Douglas*, 2016 WL 5661203, at *9 (S.D. Ga. Sept. 29, 2016) (finding officers had reasonable suspicion to conduct traffic stop based upon "recent criminal activity in the area," and activity at "a presumptively abandoned house"); *see also, e.g., United States v. Anderson*, 273 F. Supp. 2d 921, 928 (E.D. Mich. 2003) ("The fact that the officers observed four individuals standing in front of a dark, apparently vacant house in an area known for drug activity was sufficient evidence to provide officers with reasonable suspicion to briefly detain the four individuals for investigative questioning."). It is clear, therefore, that Captain Ashdown had reasonable suspicion sufficient to justify his initial stop, which occurred when he activated his lights and blocked the driveway.

The conclusion that Ashdown had reasonable suspicion to seize and initiate contact with Spencer does not end the inquiry. Spencer points out that an initial seizure, like a traffic stop or a *Terry* stop, although justified at its inception, may ripen into a Fourth Amendment violation. *See* doc. 25 at 5-7. Spencer's point is well-taken, even if the authority he

11

cites—discussing the unreasonable extension of traffic stops—is not directly on-point.[8]

Captain Ashdown's interaction with Spencer, before he observed—or was even in a position to observe—the contraband in plain view was not limited to the initial seizure. After the stop, but before questioning commenced, Ashdown drew his weapon and commanded Spencer to return to his car. Arguably, that more forceful restriction on Spencer's movement was an escalation of the *Terry* stop, such escalations *may* convert a *Terry* stop into a *de facto* arrest, requiring probable cause. *See, e.g., United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (even where a court determines that an initial *Terry* stop was justified by reasonable suspicion at its inception, it must then determine "whether the stop went too far and matured into arrest before there was probable cause"). Here, however, neither the weapon nor the command to return to the vehicle exceeded the parameters of a *Terry* stop.

---

[8] There was no traffic stop here. Captain Ashdown explained that he turned on his blue lights and blocked the driveway either to investigate the anonymous report of drug sales or to investigate Spencer's presence near an apparently abandoned house in a high crime area. Defendant's citation to cases involving the permissible parameters of a traffic stop, therefore, are inapposite.

Although Ashdown's decision to detain Spencer was not a "traffic" stop, the fact that he was in a vehicle when officers initially approached is relevant. The Supreme Court has long recognized the particular risk, indeed the "inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Balanced against that risk, "the intrusion into the driver's personal liberty occasioned not by the initial stop . . ., which was . . . justified, but by the *order*" to either exit or remain in the car, "can only be described as *de minimis*." *Id.* In such a context, an officer's exercise of "unquestioned command" of an individual's movements is justified. *See, e.g., United States v. Gibbs*, 917 F.3d 1289, 1297 (11th Cir. 2019) ("courts have repeatedly recognized the danger inherent in traffic stops . . . and the concomitant need [for officers] to exercise 'unquestioned command of the situation.'" (citing *Arizona v. Johnson*, 555 U.S. 323, 330 (2009); *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997)). The fact that Captain Ashdown "ordered" Spencer to return to his vehicle, therefore, did not convert the lawful investigatory stop into an arrest.

Similarly, the Ashdown's briefly drawing his weapon did not convert the stop into an arrest. The Eleventh Circuit has expressly

13

recognized that "an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon . . . ." *Acosta*, 363 F.3d at 1147; *see also United States v. Rouse*, 2009 WL 1550860, at * 4 (S.D. Ga. June 1, 2009) ("Officers effectuating a *Terry* stop may draw their weapons and use reasonable force when legitimate safety concerns call for such measures."). Ashdown testified that, after he had activated his lights and positioned his vehicle to effect the seizure, Spencer exited his car and approached quickly and aggressively. Given that apparent aggression, Ashdown drew his weapon as he commanded Spencer to return to the vehicle. He also testified that he holstered his weapon after Spencer returned to his car. Briefly drawing his weapon when Spencer was quickly approaching him with uncertain intentions, did not convert the *Terry* stop into an arrest. *See United States v. Roper*, 702 F.2d 984, 987-88 (11th Cir. 1983) (where an officer expresses a reasonable safety concern, drawing his weapon does not convert a *Terry* stop into an arrest).

After Spencer had returned to his vehicle, Ashdown approached him to determine why he was parked near the derelict structure. He approached the car where Spencer was sitting and requested identification. As Spencer leaned over to retrieve his identification,

14

Ashdown observed a plastic bottle containing what he immediately identified as crack cocaine.  The Government correctly argues that, once he observed contraband in plain view, he had probable cause to conduct a full search of the vehicle, implicitly invoking the so-called "automobile exception."  *See* doc. 27 at 10 ("It is long-settled that an officer's discovery of contraband in open view provides probable cause for the search of a mobile conveyance.") (citing, *inter alia.*, *United States v. Lara*, 517 F.2d 209, (5th Cir. 1975)[9] ("Once the vehicle was stopped, the contraband was in plain view furnishing probable cause for the subsequent search.")); *see also United States v. Alston*, 598 F. App'x 730, 734 (11th Cir. 2015) (concluding that the automobile exception applied to search of vehicle used in drug-trafficking crime based on probable cause to believe it contained "additional evidence of drug-trafficking activity, such as drug paraphernalia, cash, or records of drug transactions, among other things.").  The application of the "automobile exception" is also suggested in the analysis of the other case the Government cites.  *See* doc. 27 at 10 (citing *United States v. Hafford*, 2011 WL 2269161, at * 3 (M.D. La. June

---

[9]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

15

7, 2011) (recognizing that "[f]ederal courts have consistently recognized that warrantless searches of vehicles are permitted when probable cause exists to believe that the vehicle contains contraband, [cit.], a Fourth Amendment principle commonly referred to as the 'automobile exception.'")). The Court agrees that Ashdown's observation of crack cocaine[10] in plain view provided probable cause, and the resulting search produced all the evidence at issue.[11]

---

[10] The "plain view" doctrine requires that the incriminating or contraband nature of the evidence observed must be "immediately apparent." *See, e.g.*, *Texas v. Brown*, 460 U.S. 730, 737 (1983) (explaining that the "plain view" justification for seizing evidence without a warrant requires, among other elements, that "it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure."). Here, as in *Hafford*, "[t]he incriminating nature of the substance [observed in the vehicle] was immediately apparent, as [the observing officer] recognized the substance as [an illicit drug]." 2011 WL 2269161, at * 3.

[11] A police report attached to the Government's brief, but never admitted into evidence, indicates that Spencer was arrested for possession of the discovered drugs "with intent," presumably, to distribute them. *See, e.g.*, doc. 27-2 at 3. Observation of contraband in plain view, thus, provided probable cause for his arrest. *See, e.g.*, *Minnesota v. Dickerson*, 508 U.S. 366, (1993) ("if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment . . . ."); *United States v. Murray*, 659 F. App'x 1023, 1026 (11th Cir. 2016) (finding probable cause to arrest a suspect based on his possession, in plain view, of a baggie containing marijuana). Although the Supreme Court has narrowed the circumstances in which a vehicle may be searched incident to an arrest, it has recognized the legitimacy of such searches where it is reasonable to believe evidence relevant to the crime of arrest may be found in the vehicle. *Arizona v. Gant*, 556 U.S. 332, 333-34 (2009). "[W]here a [vehicle's] occupant is arrested for a drug offense, as opposed to a traffic offense, 'the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Alston*, 598 F. App'x at 733 (quoting *Gant*, 556 U.S. at 344). Since no evidence concerning the

Accordingly, Spencer's suppression motion should be **DENIED**. Doc. 25. The initial detention, which occurred when Ashdown activated his lights and blocked Spencer's car, was a valid *Terry* stop. Although Ashdown's drawing his weapon and commanding Spencer to return to his vehicle escalated the stop, neither resulted in Spencer's *de facto* arrest. Once Ashdown observed what he believed to be contraband in plain view, he had probable cause to arrest Spencer. Finally, a search of the vehicle was justified under the automobile exception. As a result, at no point in the sequence of events did Captain Ashdown's conduct exceed the boundaries imposed by the Fourth Amendment. There is no basis to suppress any of the evidence obtained.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to the R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for

---

offense of arrest was admitted and Government argues exclusively that the contraband discovered in plain view provided probable cause for a full search, the there is insufficient evidence to support the independent alternative that the search was valid incident to the arrest.

additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this <u>10th</u> day of October, 2019.

*/s/ Christopher L. Ray*
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA